UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JEREMY COKER                                    CIVIL ACTION

VERSUS                                          NO. 08-678

JACK STRAIN, ET AL                              SECTION "C" (4)

ORDER AND REASONS

The plaintiff, Jeremy Coker ("Coker"), brings an Eighth Amendment claim for deliberate indifference under 42 U.S.C. § 1983 against the following:  Rodney J. Strain Jr., Sheriff of St. Tammany Parish ("Sheriff Strain"), in his official and individual capacities; and Marlin Peachey, former warden of the St. Tammany Parish Jail ("Warden Peachy"), Greg Longino, the current Warden ("Warden Longino"), David Hanson, a captain at the jail ("Captain Hanson"), and two of the jail's deputies, Gregory Perkins ("Deputy Perkins") and Joseph Boocker ("Deputy Boocker"), in their individual capacities.  Coker also brings a pendant state-law claim for negligence against the same defendants in the same capacities under La. Civ. Code art. 2315.

Coker's motion for partial summary judgment and the defendants' motion for summary judgment are now before the Court.  Having considered the record, the memoranda of counsel, and the law, the Court denies Coker's motion.  The Court grants in part and denies in part defendants' motion for summary judgment.  As a result of these holdings, all of Coker's individual-capacity claims are dismissed.  Coker may,

however, proceed on his official-capacity claims against Sheriff Strain.

## I.  Facts and Proceedings

The following facts are undisputed.  In February 2007, Coker was incarcerated in the St. Tammany Parish Jail awaiting trial on a charge of possession of a firearm by a convicted felon.  Rec. Doc. 46, Exh. A, pp. 19–28.  Joshua Saavedra ("Saavedra"), an inmate committed to the custody of the Department of Corrections, was temporarily housed in the same jail on a charge of parole violation.  Rec. Doc. 46–10, p. 9.  Coker was classified as a "minimum" security inmate and Saavedra was classified as a "medium" security inmate.  Rec. Doc. 47–7, Exh. D, pp. 14-15.  Those classifications were based on objective factors including the inmates' histories, propensity for violence, and the nature and severity of the pending criminal charges.  Rec. Doc. 46–8, pp. 18–24.  Sheriff Strain's office, the operator of the jail, classified inmates as minimum, medium, or maximum security and then housed inmates of different security classifications separately.  *Id.*; Rec. Doc. 47, Exh. D, pp. 15–24.

That was, at any rate, the way things were supposed to work.  In February 2007, the jail had too little space to separate inmates according to their security classifications.  Rec. Doc. 47, Exh. D, pp. 18-24.  So it ended up that Coker and Saavedra were both housed in dorm C600, located in the jail's C-Building.  Rec. Doc. 46–9, p. 27.  The C-Building has four such dorms, C500, C600, C700 and C800, which each house 50 inmates.

Rec. Doc. 46-A, p. 52.  In the middle of each dorm is an elevated pod that serves as the control booth.  Rec. Doc. 46–4, p. 35.  The design of the St. Tammany Parish Jail specifically contemplated that one deputy in the control pod and one deputy on the ground, the "runner" deputy, would monitor Dorm C.  Rec. Doc. 50, Exh. B pp. 33–36; Rec. Doc. 46–8, p. 16.

The control-pod deputy has a view of the dorm from the pod's windows, but his view can be blocked by inmates.  Rec. Doc. 50, pp. 37–38; Rec. Doc. 46–9, pp. 23–24.  To correct for this, the jail uses two main video cameras in each dormitory and ten additional cameras, two located in each hallway leading to the dormitories, to feed additional views to the control booth.  Rec. Doc. 46–4, pp. 54–56.  A single deputy monitors all eighteen feeds using two monitors in the control booth.  *Id.*  Those two monitors do not display all eighteen feeds simultaneously; instead, the feeds rotate.  *Id.*  Because the deputy in the control booth is charged with monitoring the inmates, he may not leave the control booth and must rely on the "runner" deputy to interact with the inmates.  Rec. Doc. 46–4, pp. 29–30.

On February 4, 2007, Saavedra attacked Coker from behind while both were in C-Building.  Rec. Doc. 46, Exh. A, pp. 33–36, 41–47.  Coker was knocked unconscious and suffered a serious head trauma.  *Id.*  The attack occurred in an area that could not be seen on any of the video feeds, known as a blind spot or a "cut-out."  *Id.*  The locations of

3

these cut-outs throughout C-Building were well known to the inmates and guards.  Rec.

Doc. 46–6, pp. 32–40; Rec. Doc. 46–4, pp. 48–53.  Saavedra testified in his deposition that

he took advantage of these areas to avoid getting caught.  Rec. Doc. 47-5, pp. 25-26.

Prison officials knew that inmates such as Saavedra knew of the locations of the cut-outs

and took advantage of them to start fights.  Rec. Doc. 46-6, pp. 32–40; Rec. Doc. 46–4, pp.

48–53.

The officer monitoring the control booth at the time of the fight was Deputy

Boocker.  Rec. Doc. 47, p. 5.  He was the only correctional officer in C-Building at the

time the fight broke out (the other deputy assigned to that shift was on break).  *Id.* at pp.

5, 31–32.  He could not see the fight from the windows of the control booth because he

was looking in the opposite direction when the fight started, and, from above, he could

not see it on the video monitors because it occurred in a cut-out.  Rec. Doc. 46–4, p. 36.

So, Deputy Boocker learned of the fight only after several inmates activated an internal

alarm system to alert him.  Rec. Doc. 46–4, p. 33.

Once Deputy Boocker realized that a fight was in progress, he contacted the

jail's medical department for assistance.  Rec. Doc. 46–4, p. 39.  He could not, however,

assist Coker himself as, again, St. Tammany Parish Jail policy prohibited him from

leaving his post to assist.  Rec. Doc. 46–4, pp. 31–39.  So, it was medical personnel who

ultimately removed Coker from the building.  Rec. Doc. 46, Exh. A, pp. 41–44.  Coker

4

was then taken by ambulance to a hospital where he was treated for his injuries.  *Id.*; Rec. Doc. 47, p. 5.  Coker claims that, as a result of the attack, he suffered brain damage, impairment of sight and hearing, impairment of basic motor skills, emotional distress and mental pain and suffering, medical expenses, and physical pain and suffering.  Rec. Doc. 46, Exh. A, pp. 46–66.

## II. Analysis

### A.  Standard of Review

The Court may grant summary judgment only when there are no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "[T]he party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact."  *Taita Chemical Co., Ltd. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001) (internal quotation marks omitted).  The party opposing summary judgment must then "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56); *see Provident Life and Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001).

"A factual dispute is 'genuine' if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir.l989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is 'material' if it might affect the outcome of the suit under the governing substantive law." *Id.* In order to create a jury question on an issue, "there must be a dispute in the substantial evidence, that is, evidence which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Chaney v. New Orleans Pub. Facility Management*, 179 F.3d 164, 167 (5th Cir. 1999).

**B.  The Federal Claim**

**1.  The Law of 42 U.S.C. § 1983**

Title 42, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

So, to prevail on a § 1983 claim, the plaintiff must show that "the conduct complained of was committed by a person [or persons] acting under color of state law and . . . [that] this conduct deprived [the plaintiff] of rights, privileges or immunities secured by the constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527,

535 (1981).  Actions taken under color of state law for purposes of § 1983 fall into two

categories: those performed in a personal capacity and those performed in an official

capacity.

　　　"Official capacity suits generally represent another way of pleading an action

against an entity of which an officer is an agent ." *Burge v. Parish of St. Tammany*, 187

F.3d 452, 466 (5th Cir. 1999).  To establish liability against a government official in his or

her "official capacity," a § 1983 plaintiff must show that a policy or custom formulated

and implemented by the official "must have played a part in the violation of federal

law." *Hafer v. Melo*, 502 U.S. 21, 28 (1991).  That is, "the plaintiff must show that the

municipality has a policy or custom that caused his injury." *Parm v. Shumate,* 513 F.3d

135, 142 (5th Cir. 2007).  "A plaintiff may not infer a policy merely because harm resulted

from some interaction with a governmental entity." *Colle v. Brazos County, Texas*, 981

F.2d 237, 245 (5th Cir. 1993).  Rather, he must identify the policy or custom that allegedly

caused the deprivation of his constitutional rights.  *Id.*

　　　Individual- or personal-capacity claims are different.  "Plaintiffs suing

governmental officials in their individual capacities . . .  must allege specific conduct" by

the officials "giving rise to a constitutional violation." *Oliver v. Scott*, 276 F.3d 736, 741

(5th Cir. 2002) (internal citations omitted).  "Personal involvement is an essential element

of" this cause of action. *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983).  So, a

supervisor may not be held individually liable under § 1983 based on a theory of vicarious liability. *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987); *see also Oliver*, 276 F.3d at 742; *Harris v. Greer*, 750 F.2d 617, 618 (7th Cir. 1984). More than conclusional assertions of personal action are required as well; "[t]he plaintiff must allege *specific* facts giving rise to the constitutional claims." *Oliver*, 276 F.3d at 741 (emphasis added).

### 2. Discussion

#### a. Individual-Capacity Claims

The parties' talk past each other on the issue of defendants' personal liability because they do not pay careful attention to the actual allegations in Coker's complaint. Its operative section reads:

> The beating which Mr. Coker suffered at Saavedra's hands resulted from defendants' deliberate indifference to the serious risk of harm under which Mr. Coker was incarcerated, including but not limited to:
>
> > (a) commingling a violent felon such as Saavedra with non-violent pre-trial detainees with as Mr. Coker;
> > (b) under-staffing the jail so that a single correctional officer was charged with supervising two hundred (200) inmates;
> > (c) allowing camera blind spots to exist when defendants had knowledge that prisoners could take advantage of such cut-outs to do violence to other inmates; and
> > (d) failing to properly train and supervise correctional officers to manage the inmate population or provide necessary medical care.[1]

---

[1] Rec. Doc. 1, pp. 5–6. Coker has, however, abandoned his contention that the correctional officers were not properly trained. *See* Rec. Doc. 49, p.2 n.1.

Yet Coker offers no evidence that Wardens Peachy and Longorio, Captain Hanson, or Deputies Perkins and Boocker were personally responsible for any of this. Without argument or evidence to the contrary, the Court cannot accept that a jail's deputies are responsible for its staffing levels or that a captain at the jail is responsible for the design of its security system. The Wardens are higher up, but Coker elaborates no theory for why they are personally responsible for what are, at bottom, policy decisions.[2] That he was required to do. *Oliver*, 276 F.3d at 741.

Put another way, Coker does not explain what the wardens, captain, or deputies should have done about the alleged wrongs that he claims resulted in his injury—other than perhaps to quit in protest.[3] A duty to do so may exist when a policy or web of policies is so clearly unconstitutional that no reasonable person would follow the policy, but this is not such a case.

Wardens Peachy and Longorio, Captain Hanson, and Deputies Perkins and Boocker, did not in any meaningful sense "cause" the sequence of events that Coker claims led to his injury, so the Eighth Amendment claims against them must be

---

[2] The deposition of Sheriff Strain seems to place responsibility on the wardens for recommending, e.g., the appropriate staffing levels, but makes clear that the sheriff has the ultimate say-so on such matters if only because he controls the purse strings. Rec. Doc. 46–1, pp. 29–36.

[3] In fact, Coker admits that at least some prison employees tried to effectuate change by "bring[ing] up the subject of the blind spots and suggest[ing] that something should be done." Rec. Doc. 46–3, p. 6.

dismissed.  But to the extent that these defendants might be "but for" causes of Coker's injuries in some sense, the Court notes that they would be entitled to qualified immunity.  At the time that Wardens Peachy and Longorio, Captain Hanson, and Deputies Perkins and Boocker acted, it was not clearly established that any of their actions would violate the Constitution.  *See, e.g., Johnson v. Johnson,* 385 F.3d 503, 524 (5th Cir. 2004).  Coker's motion for partial summary judgment on these claims is denied, and the defendants' is granted.  These claims are dismissed.

That leaves the individual-capacity claim against Sheriff Strain.  As discussed below, a jury might well determine that the web of policies Coker points to as causing his injuries evidenced a deliberate indifference to his well-being.  Standing alone, however, that does not mean that Sheriff Strain was on notice that these policies could constitute deliberate indifference.  None of the cases Coker cites could have provided that notice to Sheriff Strain either.  Without clearly established law on this point, Sheriff Strain must be granted qualified immunity.  *See, e.g., Lytle v. Bexar County, Texas,* 560 F.3d 404, 410 (5th Cir. 2009).  Defendants' motion for summary judgment on the individual-capacity Eighth Amendment claim against Sheriff Strain is granted, and Coker's motion for partial summary judgment on the same is denied.  This claim is dismissed.

**b. Official-Capacity Claim**

The Court now turns to Coker's claim against Sheriff Strain in his official

capacity, that is, as the policymaker for the St. Tammany Parish Jail.  It is apparent to the

Court that the defendants' motion for summary judgment is based on a

misunderstanding of Coker's claim.  He claims that it is the *cumulative* effect of the jail's

policies on classification and housing of inmates, understaffing, and monitoring of

inmates that amounted to deliberate indifference.  Defendants ignore the cumulative

effect of these policies in favor of arguing that each of Coker's allegations standing alone

would be insufficient to support relief.

For example, defendants assert that Coker had no constitutional right against

being housed with Saavedra.  It is true that the classification of inmates is typically

relegated to the broad discretion of prison officials.  *Mikeska v. Collins*, 900 F.2d 833, 836

(5th Cir. 1990); *see also Stewart v. Thigpen,* 730 F.2d 1002, 1005 (5th Cir. 1984); *Smith v.*

*Rabalais,* 659 F.2d 539, 545 (5th Cir. 1981).  But that would still not excuse all housing

decisions.  Here, the prison determined that Saavedra—a prisoner with a history of

committing violent offenses like burglary and battery, Rec. Doc. 47–6, pp. 2–3—was

more dangerous than Coker and yet still housed them together.  It did not do so because

it thought that was the safest course, but because it did not have the space to do

otherwise.  Rec. Doc. 47, p. 13.

The mere fact that they were housed together would probably not be sufficient to state a claim for deliberate indifference.  That is not what Coker claims in any event. He asserts that the prison officials demonstrated deliberate indifference to his well-being by adopting policies that house him with a more dangerous inmate like Saavedra, *and* house them together in a building with a security system that made it easier for inmates to start fights undetected (all the while knowing that inmates were aware of the security system's defects and took advantage of them), *and* then having too few staff on hand to respond promptly to a fight.

So, contrary to defendants' characterization of his complaint, Coker does not claim an unqualified right to have "every square inch" of any given prison monitored by video at all times.  A prison filled only with minimum-security inmates might well get by with quite relaxed inmate monitoring.  Or, a prison filled with more dangerous inmates might get by with the type of security system installed in C-Building if it has sufficient staff to break up any fights before a prisoner is seriously injured.  Or, a prison with inmates of mixed security classifications might get by with the security system and staffing levels present in C-Building so long as the inmates are not aware of the security system's vulnerabilities.  Coker does not dispute any of this.  Instead, he asserts that the St. Tammany Parish Jail could not constitutionally get by with problems in all three areas.  A reasonable jury could conclude Coker is right, as a survey of the law of

12

deliberate indifference will show.

The parties agree that the standard governing a prison official's failure to prevent harm by other inmates is set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994); *see also Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006).  The plaintiff must show that he was "incarcerated under conditions posing a substantial risk of serious harm," and that the defendants acted with "deliberate indifference" to his health or safety.  *Id.* at 836.

"Deliberate indifference" lies between negligence and purpose or knowledge; it is "the equivalent of recklessly disregarding [a] risk."  *Id.*  This recklessness standard means that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety."  *Id.* at 837.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.*  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Id.* at 842.  It does not matter whether the risk comes from a single source or from multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all

prisoners in a situation face such a risk.  *Id.* at 843.

A reasonable jury could conclude that the mixing of inmates of different security classifications, the defects in Dorm C's surveillance system, and the fact that at times only one deputy was on duty in Dorm C—and that deputy could not leave his post to break up a fight—created a substantial risk to inmate safety.  *See, e.g., Edwards v. Gilbert,* 867 F.2d 1271 (11th Cir.1989); *Anderson v. City of Atlanta,* 778 F.2d 678, 685 (11th Cir.1985). None can question that the policies which led to this risk were deliberate.  Moreover, a reasonable jury could conclude that Sheriff Strain was aware of the risk created by his policies and consciously disregarded it.  *See, e.g., Greason v. Kemp,* 891 F.2d 829, 838 (11th Cir.1990).

Of course, a reasonable jury could conclude otherwise, since "the obviousness of a risk is not conclusive and a prison official may show that the obvious escaped him."  *Id.* at 843.  It is, however, no answer that Sheriff Strain did not foresee this particular attack. A prison official may not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was likely to be assaulted by the specific prisoner who eventually committed the assault."  *Id.*

Coker did not move for summary judgment on this claim, but the defendants did. Their motion is denied.  Coker may proceed to trial on his official-capacity Eighth

14

Amendment claim against Sheriff Strain.

## C.  State Law Claims/Qualified Immunity

The defendants seek dismissal of the pendent state-law claim for negligence

under La. Rev. Stat. 9:2798.1(B), which provides:

> Liability shall not be imposed on public entities or their officers or employees
> based upon the exercise or performance or the failure to exercise or perform their
> policymaking or discretionary acts when such acts are within the course and
> scope of their lawful powers and duties.

The defendants provide no further support for their broad assertion that all state-

law claims against the defendants must be dismissed on this basis.  For example, the

statute excepts conduct which is "reckless."  La. R.S. 9:2798.1(C)(2).  Coker does not

address the meaning of the statute but simply contends that the same evidence which

supports his claim of deliberate indifference would also support his claim of negligence.

Neither side has briefed this issue thoroughly, but the Court considers its analysis

from above instructive.  The claims against Sheriff Strain, Wardens Peachy and

Longorio, Captain Hanson, and Deputies Perkins and Boocker in their individual

capacities must be dismissed because their individual-capacity actions were not the real

"cause" of Coker's injuries.  The claim against Sheriff Strain in his official-capacity

survives for the same reasons the Eighth Amendment claim survives.  Clearly, policies

that a jury could find are deliberately indifferent to inmate safety are policies that a jury

could find are reckless, and therefore exempted from the immunity statute defendants

cite.

### III.  Conclusion

As the Supreme Court has noted, courts are aware that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions" and that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).   However, wide range does not allow promulgation of prison policy and procedure that disregards inmate safety.  Such conduct is tantamount to simply permitting "nature to take its course," which the Supreme Court in *Farmer* found constitutionally impermissible.   *Farmer,* 511 U.S. at 833.

Accordingly,

IT IS ORDERED that the motion for summary judgment filed by Rodney J. Strain Jr., in his capacity as Sheriff of St. Tammany Parish, on plaintiff's Eighth Amendment and state-law claim is DENIED.

IT IS FURTHER ORDERED that the defendants' motion for summary judgment is GRANTED as to all of plaintiff's claims against (1) Rodney J. Strain, (2) Warden Marlin Peachy, (3) Warden Greg Longino, (4) Captain David Hanson, (5) Deputy Gregory Perkins, and (6) Deputy Joseph Boocker, in their individual capacities.

16

IT IS FURTHER ORDERED that the plaintiff's motion for summary judgment on the issue of qualified immunity is DENIED.

New Orleans, Louisiana, this 30th day of September, 2010.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE